IN RE SENERGY AND THORO CLASS ACTION SETTLEMENT, 1999 NCBC 7

| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
|---|---|---|
| COUNTY OF NEW HANOVER | ) | SUPERIOR COURT DIVISION |
| | | CIVIL ACTION NO. 96-CVS-5900 |

| IN RE SENERGY AND THORO | ) | **ORDER ON PETITION** |
|---|---|---|
| CLASS ACTION SETTLEMENT | ) | **FOR ATTORNEY FEES** |

{1} This matter is before the Court on the petition for attorney fees and expenses filed by class counsel in connection with the partial settlement of this class action involving Defendant Senergy, Inc. and Thoro Systems Products, Inc. (hereinafter the "Settling Defendants"). The Court has previously approved the settlement of the class claims against the Settling Defendants. Claims against the remaining defendants are set for trial. For the reasons set forth below, the Court has provided an initial fee and supplemental fee plan to compensate class counsel for their efforts.

I.

A.

{2} This action was commenced on January 5, 1996 against nine defendants, including Senergy, Inc., who among them provided the vast majority of synthetic stucco or Exterior Insulation and Finish Systems ("EIFS") to the marketplace in North Carolina and nationally. Settling Defendants account for approximately ten percent (10%) of the national market.

{3} The action was certified as a class action by Judge Ernest B. Fullwood on January 9, 1996 and subsequently recertified by Judge Fullwood on September 18, 1996. Thereafter the case was assigned to this Court under Rule 2.1 of the General Rules of Practice for the Superior and District Courts. After the settlement with the Settling Defendants and an appeal of another of this Court's orders, this Court bifurcated the remaining claims of liability and damages and ordered separate trials for each of the remaining defendants on the issues of defective product design and failure to warn. That order has been appealed.

{4} This class action constitutes but one facet of a multidimensional national litigation problem. Thousands of individual actions have been filed across this state and the nation by individual homeowners against the defendants in this action and the builders and others associated with the construction of their homes using synthetic stucco. Over six hundred potential class members have opted out of the class in this action. Other class actions have been filed and may be filed in the future in the federal courts and other state courts. Class counsel in this action have represented and may, in the future, represent parties in other similar litigation. *See, e.g., In re Stucco Litigation*, 175 F.R.D. 210 (E.D.N.C. 1997). In addition, the industry wide nature of the original action brought by plaintiffs' counsel puts the potential recovery in this lawsuit into the megafund category. Earlier attempts at a nationwide, industry wide settlement in this case failed.

{5} Afloat in this sea of litigation, Settling Defendants and class counsel crafted a settlement agreement that covered only homes constructed using the Settling Defendants' products. This Court ultimately approved that agreement, which was subsequently modified several times with court approval. The original agreement as modified and approved by the court is hereinafter referred to as the "Settlement Agreement." Specific terms of the Settlement Agreement are pertinent to the matter currently before the Court.

{6} The settlement included a recovery program for homeowners. That recovery program provided for an

initial inspection of their homes. If they qualified for remediation of problems associated with the use of Settling Defendants' products, they could have repairs made to their property. The settlement included limited homeowners warranties. Under some circumstances, class members could receive a cash-out option of four dollars per square foot of EIFS installed on their property. At this stage of the settlement history, the cash-out option has been used almost exclusively. Former owners of a property on which the Settling Defendants' EIFS had been installed were entitled to a payment of actual damages up to one thousand dollars ($1,000.00). A claims administrator was appointed to administer the recovery program. The administrator's fees are paid out of the funds set aside to pay for the program.

{7} Under the terms of the settlement, the Settling Defendants waive certain defenses. In addition, the settlement contained provisions that were beneficial to class members with respect to the tolling of the statutes of limitations and repose. Some barred claims may have been revived.

{8} Significantly, the benefits of the settlement were assured by the acquisition of an insurance policy that insures payment of the first twenty million dollars ($20,000,000.00) in benefits, costs of administration, and attorney fees. If the $20,000,000.00 is exceeded, assurance of payment disappears, but Settling Defendants may continue to financially support the settlement program. If Settling Defendants decide not to continue their support of the program, plaintiffs in this action may pursue this action on behalf of remaining class members, or the uncompensated class members themselves can litigate individually, with the statutes of limitation and repose having been tolled. Thus, the costs and benefits of the program are fully funded up to $20,000,000.00, but could go higher. Class members who remain uncompensated after the initial fund is exhausted will still have a remedy, but will have to look somewhere other than the fund for compensation for their damages.

{9} In real terms, the Settlement Agreement provides homeowners with about 30 to 40 cents on the dollar to cover their damages. It does not fully compensate them. However, it does provide immediate funds for repair to their homes. In addition, since the first twenty million dollars of the settlement is assured, the prospect of no recovery in the event of financial failure of the Settling Defendants is eliminated. The settlement also left the homeowners free to pursue claims against contractors and others for the balance of their losses. In this respect the settlement mirrored what was happening in the settlement of the individual lawsuits, where damages are being apportioned among the contractor, subcontractors, EIFS manufacturers and others. The settlement was a hard fought compromise that the Court believed was in the best interests of the class members. It was a good, workman-like settlement. It was not exceptional. An exceptional settlement would have fully compensated class members for their damages.

B.

{10} The Settlement Agreement provided that class counsel could request up to thirty percent of the twenty million dollars of insured payments for fees and expenses. The Notice of Settlement informed class members that class counsel would ask for an award of fees and expenses of up to thirty percent of the insured portion of the recovery program. No class member appeared at the Final Settlement Hearing to object to the fee request. Class counsel have filed a fee request seeking six million dollars ($6,000,000.00), or thirty percent, as an award of attorney fees and expenses in this case. The amount awarded by the court will be deducted from the pool of insured funds for claimants under the recovery program. If class counsel were awarded the full fee, the amount remaining to fund the recovery program for class members would be reduced to fourteen million dollars.

{11} In an unusual development in class action settlements, Settling Defendants have objected to the fee request. Normally a class action settlement results in creation of a closed end fund to which defendants contribute, and their involvement ends there. The court controls the disbursement of the funds, including allocation of the fund among class members and their counsel. In this case, the recovery program may not be closed at the amount insured, and, conceivably, Settling Defendants could elect to pay out more under the recovery program if and when the first twenty million dollars is exhausted. Therefore, Settling Defendants have a vested interest in the amount of attorney fees awarded by the Court. The more money

left in the insured pool, the less likely it will be that the insured pool is exhausted and that they will be called upon to decide whether to contribute more to the recovery program. For that reason, Settling Defendants have taken an adversarial position on the award of fees and expenses in this case.

{12} In making their fee request, class counsel have placed all of their eggs in one basket. They ask the Court to award them thirty percent of the insured pool without regard to whether it is fully consumed, without regard to the specific time and expense directly attributable to the case against the Settling Defendants, and without regard to the actual benefits to the settlement class. Class counsel have taken an industry wide, national approach to this litigation for purposes of justifying their fee application. This is reflected in their lodestar figures, which are intended to show work done on all aspects of the stucco litigation in and out of North Carolina. Class counsel have taken this same approach to the case as a whole. Class counsel's insistence on this industry wide approach to all aspects of this litigation has proved troublesome in many aspects of this case, and now raises problems for the Court in its determination of the fee issues. The reasons the industry wide approach poses problems will be discussed more fully herein.

C.

{13} The total amount ultimately paid by Settling Defendants will depend on a number of factors that cannot be fully known at present, including the number, timing and nature of the claims to be made, the costs of administration, and the potential need for further notice to the class. The large number of opt-outs may significantly reduce the claims under the recovery program and still generate liability for the Settling Defendants in other cases. The recovery program is a work in progress, and the true benefit to the class will only become apparent over time. The Court has waited to rule on the attorney fee award in order to assess the effectiveness of the recovery program. At this point, the program has undergone enough adjustments and has been in operation sufficiently long to allow for a limited assessment of how the recovery program will benefit class members.

{14} Settling Defendants are required to file a monthly report with the Court detailing the effectiveness and operation of the recovery program. Not unexpectedly, there have been problems and adjustments made in the recovery program. Class counsel have remained actively involved with the administration of the program and have persistently protected the interests of the class members.

{15} The last report submitted to the Court indicates that of the total of 995 claims filed with the Claims Administrator, 586 have been identified as Settling Defendants' products, 144 are unidentified and 265 have been identified as other manufacturers' products. All fully processed claims have been cashed out with a total payment of $1,190,171.20 and inspection costs of $5,151.10. Since all settlements have been by cash-out, no repairs have been made and no warranties have been issued. Homeowners appear to want their money to repair their homes in the manner best suited to their needs and desires. Settling Defendants have obviously found this the most economic route to follow. It eliminates the cost of repair and warranty and puts a total end to the claim. It also reduces administration costs, leaving more money to pay claims. It is fair to say that the total benefit to class members of the recovery program, including cost of administration and excluding notice cost, is approximately one million, five hundred thousand dollars ($1,500,000.00) through the end of June 1999.

{16} The program has many more years to run and further notice may be required to reach class members. As stated above, there are many factors affecting the future payout of the settlement that are not yet known. It is possible that many homeowners with larger claims opted out. If so, they are not class members for whom a benefit has been obtained by class counsel. It is also possible that the problems are not as widespread as anticipated, or that the notice program which counsel jointly agreed upon and the court approved was inadequate. It could be that the settlement was not designed in such a way that it attracted class members to apply for benefits. Other settlements or litigation may heighten public awareness of the problem and the recovery program, leading to an increase in claims. Still, the initial

results do not indicate that the recovery program will exhaust the insured pool. It may not even come close. Thus far, the actual benefits to the class members do not coincide with the total available benefits, and the reasons for that disparity are not apparent.

## II.

### A.

{17} The initial question that the Court must decide is whether or not a common fund has been created which would support an award of attorney fees from the fund. The common fund exception to the common law rule that attorney fees should not be awarded to the prevailing party in litigation was firmly established in *Horner ex rel. City of Burlington v. Chamber of Commerce of the City of Burlington, Inc.,* 236 N.C. 96, 72 S.E.2d 21 (1952). The Court is guided in its determination of the existence of a common fund by *Bailey v. State of N.C.,* 348 N.C. 130, 500 S.E.2d 54 (1998). In that case, the Supreme Court said:

> The criteria [for appropriate fee-shifting cases] are satisfied when: each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump sum judgment recovered on his behalf.
>
> . . . .
>
> In the present case, the named Plaintiffs have recovered a determinate fund for the benefit of every member of the class whom they represent. The Defendants' liability has been proven. The qualifications for class membership have been established and the formula for computing individual refunds has been set. Thus, the judgment fund itself is a quantifiable sum that has been created by the litigation undertaken by the representative Plaintiffs. All the remaining class beneficiaries need to do in order to recover their proper refund or credit is to prove their individual claims against the judgment fund. As such, we are persuaded that the recovery at issue in this case properly constitutes a common fund for purposes of shifting attorneys' fees under the common-fund doctrine of *Horner* and its progeny.

*Id.* at 161-62, 500 S.E.2d at 72-73. The Settlement Agreement in this case provided a minimum sum that would be available to fund the recovery program and make payments to class members. The fact that the initial twenty million dollar amount may be increased does not make it an indeterminate amount. At least the minimum amount is fixed, and that is the equivalent of a lump sum judgment and a quantifiable sum. Likewise, the fact that the fund is to be distributed based on individual claims rather than a mathematical formula does not preclude the existence of a common fund. The criteria for recovery are clearly delineated. In fact, the experience with the settlement indicates that the funds are being distributed on a formula basis since every claim has been handled on cash-out basis. The fact that class members who file late run the risk that the insured pool might be exhausted does not automatically dictate a finding that this is not a common fund. *See, e.g.,* the decision of the Delaware Supreme Court in *Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039 (1996) (holding that a common fund existed even though class members' individual claims might be reduced based on the number of claimants). Based on the foregoing case law, the Court is persuaded that the settlement creates a common fund for purposes of shifting attorneys' fees.

### B.

{18} Having found that there is a common fund from which reasonable attorney fees may be awarded, the Court next turns to a discussion of the method of determining a reasonable fee under North Carolina law. This Court has a duty to look carefully at the fees sought by class counsel in common fund cases. This is an equitable proceeding, and once the common fund is recognized and a fee request made, class counsel cease to be fiduciaries to the class and become claimants against the fund. *Horner,* 236 N.C. at 97-98, 100, 72 S.E.2d at 22-24; *Goodrich,* 681 A.2d 1039. Often, the court is left as the only advocate for the class members. Even though Settling Defendants have taken a position in opposition to the fee request, they have done so for their own benefit, not that of the class. The Court has considered appointing an *amicus*

*curiae* for the purpose of briefing and presenting argument on behalf of the class members, but has elected not to do so in this case at this time. *See Goodrich*, 681 A.2d at 1042. In the future, the Court may also consider appointment of a special master to make recommendations on fee requests in instances where the time involved in reviewing the fee request and supporting documentation may be excessive.

{19} The determination of reasonable attorney fees in common fund cases is generally left to the sound discretion of the trial court. *Horner*, 236 N.C. at 97-98, 72 S.E.2d at 22-24. *See also* Federal Judicial Center, Manual For Complex Litigation, Third, sec. 24.121, at 190-91 (1995). In exercising its discretion, this court has attempted to apply established equitable precepts and will articulate its reasons for reaching the particular fee determination in this case.

{20} The Court starts its analysis of methodology to be employed with the proposition that class actions in general, and the determination of attorney fees in common fund cases in particular, involve issues of equity and require the application of equitable principles. The Court also begins this analysis with the proposition that it must exercise its discretion in common fund cases with "jealous caution, lest the administration of justice be brought into disrepute." *Horner,* 236 N.C. at 101*,* 72 S.E.2d at 24. In reaching its fee decision, the court must protect the public interests, the interests of absent class members and the interests of class counsel.

{21} There are no appellate decisions in North Carolina providing guidance on the appropriate methodology to be used by trial courts in considering class action fee requests. Therefore, this Court has looked for guidance to the methodologies employed in other states and the federal courts as well as those employed by other trial courts in this state.

{22} Federal courts have applied various methodologies to the determination of fee requests, and there is no settled approach. Thus, the federal decisions offer much information, but little certainty with respect to choice of methodology. Two good sources chronicling the history of various methodologies employed by the federal courts are *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261 (D.C.Cir. 1993), and *In re: Nasdaq Market-Makers Antitrust Litigation,* 1998 WL 782020 (S.D.N.Y.), M.D.L. No. 1023, 94 Civ. 3996 (RWS), 1998 U.S. Dist. LEXIS 17557 (S.D.N.Y.). *See also Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985). This court has concluded that the majority of federal circuit courts now leave it to the trial court's discretion to choose between the lodestar and percentage methods or some hybrid thereof in determining fees in common fund cases. Each method will be described below.

{23} Class counsel's fee request is based upon a percentage of the fund method. Under this method class counsel are simply awarded a percentage of the fund created for the class. In this case class counsel seek thirty percent (30%) of the insured amount of the settlement. The percentage of the fund method has advantages and disadvantages. On the positive side: "[I]t is easy to calculate; it establishes reasonable expectations on the part of the plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation." *Rawlings v. Prudential-Bache Properties, Inc.,* 9 F.3d 513 (6th Cir. 1993).

{24} The percentage of the fund method should reward the efficient achievement of results for the class, rather than encourage the run up of needless hours of attorney time before settlement. Adoption of a per se rule employing the percentage of the fund method would encourage more lawyers to undertake contingency fee class action cases, thus affording more representation to people who might not otherwise obtain it.

{25} A significant disadvantage to the percentage of the fund method is the potential for abuse. The potential for abuse here is the possibility that class counsel will be paid a percentage of a large award that bears no rational relation to either the amount of time spent on the case or the actual benefit to the class members. The attempt to create a large percentage fee in such circumstances is an abuse common to class action litigation, and one that can lead to detrimental public perceptions of both the bar and the

administration of justice. It is that abuse which the North Carolina Supreme Court warned against in *Horner,* and which was of concern to the Court of Appeals for the First Circuit in *In re Thirteen Appeals Arising Out of San Juan,* 56 F.3d 295, 307-08 (1st Cir. 1995) (stating that the percentage of fund method may result in the overcompensation of lawyers in situations where actions are resolved before counsel has invested significant time or resources). The percentage of the fund method may also encourage lawyers to settle too low and too quickly in order to maximize their hourly rate. *See Rawlings,* 9 F.3d at 516.

{26} Use of the percentage of the fund method may also pose problems where the determination of the "fund" itself, from which fees should be calculated, is uncertain. *See Goodrich*, 681 A.2d at 1049. The determination of the "fund" is a real problem in this case, as will be discussed in more detail.

{27} At least one judge has expressed concern that use of the percentage of the fund method can encourage frivolous lawsuits. *See* dissenting opinion of Judge Ginsburg in *Swedish Hospital Corp.*, 1 F.3d at 1273 (reliance upon the percentage-of-the-fund approach without any regard for the lodestar may produce excessively high awards and thus encourage even relatively non-meritorious cases to be brought).

{28} Another concern which the courts should have about per se adoption of a percentage of the fund method is the potential it has for dictating litigation strategy. We have reached the stage where courts are called upon to distinguish between an ordinary common fund and a "megafund," and whether different percentages should be applied depending on whether the recovery constitutes a megafund. *See, e.g., In re: Nasdaq Market-Makers Antitrust Litigation,* No. 94 Civ. 3996(RWS), 1998 WL 782020 (S.D.N.Y. Nov. 9, 1998) (where the fee awarded was one hundred and forty-three million dollars ($143,000,000.00)). Most courts now agree that the percentage of the fund should go down as the amount of the fund goes up. *Goodrich,* 681 A.2d at 1048-49. *See also* Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. at 2563; Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 14:03, at 14-13 to 14-14 (3d ed. 1992).

{29} Megafunds can result in megafees, encouraging counsel to build bigger lawsuits, particularly nationwide class actions, in an effort to maximize the potential fees generated by a larger fund in one lawsuit. The United States Supreme Court, based on concerns including, but not limited to, disparate treatment of subclasses, lack of predominance of class issues, and conflicts of interest in the representation of the class, has recently discouraged such enormous consolidation of product liability claims in two decisions: *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 138 L. Ed. 2d 689 (1997) and *Ortiz v. Fibreboard Corp.*, 67 U.S.L.W. 4632 (U.S. June 23, 1999), No. 97-1704, 1999 U.S. LEXIS 4373, 1999 WL 412604. State courts should be equally cautious.

{30} The other most widely used method of determining fees is the lodestar method. It awards fees based upon a reasonable hourly rate for the time reasonably expended to create the fund. In the past courts have added a multiplier or fee enhancer to encourage counsel to take difficult contingent fee cases. It is the lodestar method which is espoused by Settling Defendants in this case.

{31} The popularity of the lodestar method has varied over the last twenty years. At this point in time is most widely used in statutory fee shifting cases rather than common fund cases. Its main advantage, and the reason it is used in fee shifting cases, is that it sets a fee more directly related to the actual time spent on the case by counsel. Thus, it protects against abuse and the creation of a negative image for the bar and the legal system created when lawyers are grossly overcompensated. *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.* 487 F.2d 161 (3rd Cir. 1973). Thus, courts may use the lodestar method in common fund cases where the percentage of the fund method would result in a fee that is either too small or too large in light of the attorney hours devoted to the case. *See Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301 (9th Cir. 1990). The lodestar method is also useful in cases in which the nature of the settlement evades the precise evaluation needed for the percentage of the fund method. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod[s]. Liab. Litig.,* 55 F.3d 768, *cert. denied,* 516 U.S. 824, 133 L.Ed. 45, 116 S.Ct. 88 (3rd Cir. 1995). It also can be used as a check on the appropriateness of fee set by a percentage of the fund. *See Goodrich,* 681 A.2d at 1047. The

amount of work actually done by the lawyer is a fact which should never be totally ignored in deciding the fair allocation of the common fund between counsel and the beneficiaries they represent.

{32} The lodestar method has its disadvantages as well. It poses a problem for overburdened trial courts because the process of determining the lodestar can be difficult and time consuming. It may not adequately encourage lawyers to undertake difficult cases. It also may burden lawyers by requiring a more meticulous accounting of hours. In addition, the lodestar method has the potential to encourage lawyers to expend needless hours before settling. Questions will inevitably arise concerning whether the time spent was reasonable and necessary. Questions will also arise as to the proper rates to be charged. For instance, should out of state attorneys charge rates appropriate for North Carolina rather than their home state when representing North Carolina residents in class actions? In short, the lodestar method promotes inefficiency and creates issues not raised by the percentage of the fund method. *See Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. at 255. The pendulum shifts from common fund to lodestar and back again have naturally lead some courts to leave the pendulum hanging in the balance.

{33} A common modern approach to fee awards is described in *In re Thirteen Appeals Arising Out of San Juan:*

> Given the peculiarities of common fund cases and the fact that each method, in its own way, offers particular advantages, we believe the approach of choice is to accord the District Court discretion to use whichever method, POF or lodestar, best fits the individual case. We so hold, recognizing that the discretion we have described may, at times, involve using a combination of both methods when appropriate.

*In re Thirteen Appeals Arising Out of San Juan,* 56 F.3d at 308.

{34} Trial courts in North Carolina have adopted this last approach and have considered a "hybrid" of both methods. Judge Manning adopted such an approach in a detailed and well reasoned opinion in the much publicized case from Wake County, *Smith v. State of N.C.,* 95 CVS 6715 (Wake Co. Sup. Ct (Nov. 20, 1997)). This Court adopted such an approach in another Wake County case, *Byers v. Carpenter, No.* 94 CVS 04489 (Wake Co. Sup. Ct. (Jan 30, 1998)) (Tennille, J.). The Attorney General of North Carolina has consistently urged this court to take a hybrid approach when considering fee applications in cases involving consumers in North Carolina. Part of the hybrid approach is the consideration of factors other than percentage of the fund and hours worked. Judge Manning and this Court have specifically relied upon Rule 1.5 of the Revised Rules (July 24, 1997) of Professional Conduct of the North Carolina State Bar (formerly Rule 2.6(b)) in reviewing the reasonableness of fees. The Court will address below each of those factors as they relate to this case.

{35} The hybrid approach is supported by the fundamental consideration that the decision to reduce a common fund by paying attorney fees to class counsel is equitable in nature. The principle that this Court believes the North Carolina appellate courts would apply is best stated by the Delaware Supreme Court in *Goodrich:*

> This case establishes, once again, that the Court of Chancery's existing multiple factor approach to determining attorney's fee awards remains adequate for purposes of applying the equitable common fund doctrine. The adoption of a mandatory methodology or particular mathematical model for determining attorney's fees in common fund cases would be the antithesis of the equitable principles from which the concept of such awards originated. New mechanical guidelines are neither appropriate nor needed for the Court of Chancery.

681 A.2d at 1050 (citations omitted).

{36} This Court concludes that a multiple factor or hybrid test is the best method of determining attorney fees in common fund cases and the method which the North Carolina appellate courts would adopt.

## C.

{37} The *Goodrich* case is instructive on one other important fee award issue. This Court must determine whether the attorney fee award must be based on the entire fund available or whether the Court can also take into consideration the benefits actually realized by the class members. Class counsel urge the Court to follow the decision in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 62 L.Ed.2d 676, 100 S.Ct. 745 (1980), in which the Supreme Court upheld the trial judge's decision to base the fee award on the entire fund available rather than on the actual benefits derived by the class. Settling Defendants request that the Court base its decision solely on the benefits paid from the fund as was done by the Court of Chancery in *Goodrich.* The Court concludes that the decision of the Delaware Supreme Court permitting the trial court to consider the actual benefits received by class members is the correct approach and the one that would be adopted by the North Carolina appellate courts, at least under the circumstances of this case.

{38} *Goodrich* involved a claim for attorney fees against a settlement fund of $3.3 million. The fund was set up to reimburse class members for losses allegedly due to E.F. Hutton's delay in paying customers by paying them from banks more than 500 miles from the Hutton office at which the customer transacted business. The proof of claim requirements for class members posed a challenge to even the most sophisticated investor and record keeper. It was clear that many individual investors would not have adequate records to make a claim against the fund and, therefore, the fund would not be fully exhausted. There were two other significant facts about the *Goodrich* settlement relevant to this case. First, if the entire fund were not claimed, any remaining funds in escrow would be returned to Hutton. Second, if the claims exceeded the amount of the fund, each claim would be reduced on a pro rata basis. The Court of Chancery awarded a fee based upon the total amount actually paid out to class members, not the full amount of the fund, holding:

> Where because of the nature of the claim and the settlement there is good ground to suppose that there may well be a substantial non-claim problem, the most sensible way to compensate class lawyers, consistent with the underlying rationale for such awards, is on a contingency basis: that is to do as I did in this instance, to award a fair fee and make its payment coincide with the distributions to class members.

681 A.2d at 1043.

{39} The Delaware Supreme Court upheld the Chancellor's exercise of his discretion and rejected class counsel's argument (similar to that made in this case) that the court should adopt a per se rule that percentage awards should be based on the total fund available, not the actual benefits received by the class. The court first pointed out that in *Boeing* the Supreme Court neither adopted nor recommended a per se rule, but simply affirmed the trial courts exercise of its discretion under the appropriate standard of review. It then distinguished the *Boeing* decision relied upon by class counsel in this case on two grounds.

{40} First, it found that the class members in *Boeing* had a claim in a fixed amount and that Boeing's right to the fund remainder was latent. In contrast, Hutton had a vested interest in the remainder of the common fund. In this case Settling Defendants have more of a vested interest than a latent interest in the remainder of the fund. Second, in *Boeing* the class members had an undisputed and mathematically ascertainable claim to part of a lump sum judgment. In *Hutton,* class members had to submit claims and if the claims exceeded the fund, the amount to which they were entitled could be reduced. Class members in the Senergy settlement are in a similar position to those in the *Hutton* case. Their claim is not mathematically ascertainable and their recovery may depend on the number and timing of claims filed. The question of whether the common fund is an accurate quantification of the actual benefit that has been conferred exists in this case just as it did in *Goodrich.*

{41} The Delaware Supreme Court rejected class counsel's argument that they were being penalized because their fee was being conditioned on practical problems in administering the fund and events beyond their control, holding:

Goodrich's arguments demonstrate the equity in the Court of Chancery's decision. The condition precedent to invoking the common fund doctrine is a demonstration that a common benefit has been conferred. The Court of Chancery expressed concern about whether the common fund was an accurate quantification of the actual benefit that had been conferred in this case. *By conditioning the award of attorney's fees upon the claims actually submitted, the Court of Chancery exercised its discretion equitably, to correlate the attorney's compensation with the structure of the settlement benefits the attorneys had negotiated for the class.*

681 A.2d at 1049. (emphasis supplied).

{42} This Court concludes that North Carolina, like Delaware, would allow its trial judges to exercise their discretion to tie attorney fees awards to actual benefits, especially where they had a concern whether the common fund was an accurate quantification of the actual benefit conferred on the class, or where they determined that it would be equitable to correlate the attorneys' compensation with the structure of the settlement benefits the attorneys had negotiated for the class.

III.

{43} Finally, the Court turns to the application of the above principles to the fee application in this request.

A.

{44} The first step in using a multiple factor or hybrid test is to determine the benefit conferred upon the class. The class may <u>potentially</u> receive a benefit of $20 million dollars. There is no assurance that the settlement structure negotiated by class counsel will ultimately result in the full potential being reached. To date, the results would indicate that the full potential will not be reached and there is the possibility that the shortfall will be substantial. The Court concludes that at this time the common fund is not an accurate quantification of the actual benefit conferred and that it would be more equitable to align counsel fees with the actual benefits received while also giving counsel some credit for the potential recovery created.

{45} To provide counsel with a fee of six million dollars without regard to the actual benefits conferred thus far could create a situation in which counsel benefited far more than the class members. Such a disparity is the kind of abuse the court must guard against. *Horner,* 236 N.C. 96, 72 S.E.2d 21. There is a wide gap between the one million dollars in actual benefits received to date and the potential benefit of twenty million dollars.

{46} A common benefit to class action litigation is that legitimate cases which might not otherwise be pursued, due, for example, to prohibitive costs, can be heard. However, this is not a case in which claims against the Settling Defendants might not ever have been brought except for the actions of class counsel. The existence of the vast number of individual cases and the nature of what was at stake for homeowners insured that claims would be brought whether or not the class action was filed. The benefits for class members under the Settlement Agreement are similar to the benefits being obtained by homeowners in mediation in individual suits.

{47} This settlement has created significant benefits for the class. The two benefits that class counsel have created in this settlement distinct from the benefits in settlement of the individual cases are the elimination of delay involved in the individual suit and the guaranty of payment for those who get their claims in before the fund is exhausted. Acceleration and guaranty of payment are significant benefits for homeowners facing the costs associated with repairing their homes. The settlement also has the salutary effect for all concerned of treating all homeowners the same. This is not a "cost of litigation" settlement. The potential dollar value is significant and a real benefit.

B.

{48} After analyzing the benefit to the class, the second step in using a multiple factor or hybrid test is to examine the fee request against the reasonableness factors set forth in Rule 1.5 (b).

{49} <u>Time and Labor Involved</u> Analysis of this factor highlights one of the real difficulties in determining the fee in connection with this settlement. Class counsel did not request a fee based upon a lodestar, and thus did not file detailed time records, especially records from which the Court could determine how much time and effort actually went into the prosecution of the case against the Settling Defendants. Rather, class counsel have persisted in maintaining a posture that this is an industry wide case and any action taken against any defendant in any jurisdiction was an action taken on behalf of the settlement class members in this case. As Mr. William Audet, one of the attorneys for the class, stated in his affidavit: "Since early 1996, we have continued to prosecute these claims as "one" case, with various "subsidiary" cases pending in various state and federal courts." (Audet Aff. of September 11, 1998, para. 5, at 3.)

{50} Under this "consortium" approach, any counsel time spent pursuing any claim against any EIFS manufacturer would count towards the time and labor expended in reaching this settlement. The court does not intend to use the word "consortium" in any pejorative sense. It is simply the best word the court has found to describe the situation in which groups of lawyers affiliate for the purpose of establishing a common liability across many jurisdictional lines on behalf of a large group of allegedly injured parties and against a common defendant or defendants. The lawyers enter into agreements to share expenses, time and effort, and rewards.

{51} In consortium litigation, defense counsel often develop the same degree of affiliation and share expenses and labor involved in defending against the litigation in multiple jurisdictions. Class counsel in this case have been involved in other cases in other states and in the federal courts. Extensive time and effort went into a failed attempt at certification of a nationwide class in federal court. Enormous time and effort went into trying to reach a comprehensive nationwide settlement against all defendants. A class action attempt in Georgia failed. Some defendants have retained the same counsel and there has clearly been a coordinated effort on the part of defense counsel in this case. Senergy represents only ten percent of the market for these products, and there is no indication in the record that Senergy's position in the marketplace or in this case caused any unusual amount of time to be devoted to discovery of its defense. Rather, common sense dictates that discovery and other legal efforts were allocated much as the market share was allocated among the defendants. There is nothing in the record to indicate to the contrary. Thus, in trying to evaluate the time and labor involved to fairly allocate the settlement fund between counsel and the members of the settlement class (homeowners with claims against Senergy), the Court is left with the following compilation from Mr. Shipman's affidavit:

> Through the month of July, 1998, the combined time of the lawyers and paralegals who have worked on behalf of the Class Members in this case to date totals in excess of 45,000 hours. The total time expended by lawyers totals just over 31,000 hours, and the total time expended by paralegals totals just over 14,000 hours. Through the month of July 1998, the combined expenses of Class Counsel, on behalf of Class Members is $2,653,910.00. Using the hourly rates for those firms who have provided services to class members throughout the course of this litigation, there are total lodestar fees of $11,784,104.19, which, together with the expenses would compute to $14,438,017.29. The affidavits from the various attorneys who have attested to the reasonableness of the fees sought by Class Counsel indicate that $350 per hour would be a reasonable hourly rate for complex litigation of this type. However, if the Court applied even a reduced hourly rate for attorneys of $250 per hour, and $50 per hour for paralegals, then the total enhanced "lodestar" in this case including the combined expense incurred by Class Counsel, would compute to $11,242,510.00.

(Shipman Aff. of September 11, 1998, at 2.)

{52} There is no detail from which to evaluate these numbers and the numbers are not allocated between work for the original class as a whole and the members of the settlement class. Consortium litigation

raises many questions when it comes to fee issues. Was all the time reasonable? Were there too many lawyers doing the same thing? What rates were charged by lawyers from different states and by lawyers with differing degrees of experience and skill? What are the expenses claimed? Are they reasonable? How much time and expense should be attributed to other cases and should these settlement class members bear that cost? Was the cost of litigation adversely impacted by counsel's decision to sue all defendants on behalf of all homeowners, a strategy that has proved unsustainable in both state and federal courts? How much counsel time was devoted to organization and resolution of issues between counsel? Did the lure of the fee dictate the litigation strategy?

{53} It appears that at least some significant amount of class counsel's time and effort was devoted to establishing the "one case" or "consortium" model for this litigation as opposed to pursuit of claims against the Settling Defendants. Were this Court required to decide the fee based solely upon a lodestar method, the information supplied by class counsel would be insufficient to make the necessary determination. However, the Court's determination is not based solely on a lodestar method, and the information supplied is adequate for the *current* purposes. Nor does the Court have to decide in this case at this time whether it is appropriate to compensate counsel for creation of the "consortium" and for work done by other lawyers in other cases in other jurisdictions against other defendants. It is worth noting at this juncture that class counsel in cases similar to this would be well advised to maintain and submit to the court detailed time records which would help the court answer the questions posed above and any similar questions.

{54} The Court finds that a blended hourly rate of $250 an hour is <u>more</u> than adequate to compensate for the attorney time involved and that a rate of $50 an hour for paralegals is more than adequate. Thus, the $11,243,510.00 lodestar mentioned in Mr. Shipman's affidavit is the maximum that could be awarded on a lodestar calculation for the entire case, accepting class counsel's position that they are entitled to recover all consortium time and expense. It is a possibility that the lodestar would actually be reduced upon a more detailed filing and evaluation. Applying Senergy's ten percent market share to the maximum lodestar for the whole case yields a maximum lodestar for this portion of the case of $1,124,351.00. The Court believes that a detailed analysis might yield a smaller, not a larger number for determining the time and labor involved with this settlement and thus is satisfied that using that amount as a factor in this determination is fair to class counsel. Class counsel have asked for a distribution of $6,000,000.00 compared to the $1,124,351.00 determined by the court to be a fair percentage of the total lodestar for the entire case.

{55} The Court does not believe that class counsel <u>in this case</u> should be rewarded or penalized for the "one case" or "consortium" organization of the claims against the defendants in connection with this fee determination. It is difficult to say whether that strategy had a positive or negative effect on this settlement. Based upon the record before the Court, it does not appear to have had any significant impact either way. It may be that a single simple state class action lawsuit against Senergy would have produced the same result with far less time and effort. Class counsel should not be rewarded when their litigation strategy fails, for example where class counsel simply bring so many actions or consolidate so many claims in various jurisdictions that "cost of litigation" settlements result which are not truly beneficial to class members. Class counsel should be rewarded when their litigation strategy accomplishes tangible results for class members that might not otherwise have been achieved. *See* this Court's fee award in *Byers v. Carpenter, No.* 94 CVS 04489 (Wake Co. Sup. Ct. (1998)) (Tennille, J.). Neither seems to have occurred here. It is important to note here that this settlement was a nationwide settlement.

{56} <u>Novelty and difficulty of the questions involved</u> At its heart, this is a straightforward product liability case. The issues of defective design and failure to warn are not novel or difficult. The discovery needed is clearly ascertainable, even if it is voluminous.

{57} The complexity has resulted from (a) the plaintiffs' industry wide approach and their effort to obtain a judgment against all manufacturers at one time, (b) the defendants' efforts to limit their liability to individual state court lawsuits in which the contractor and other parties may be brought in to contribute towards any liability to the homeowner, and (c) the inability of our judicial systems to come to grips with

the problems inherent in mass tort or product liability litigation. Thus far, the procedural battles in federal and state courts have overshadowed the fight over substantive liability issues.

{58} The novel questions revolve around how our court systems will handle increasingly popular attempts to impose industry wide liability or establish industry wide recovery funds in certain types of cases. On the one hand, the federal courts seem to be retrenching from handling mass tort cases in nationwide class actions, and returning those cases to state courts. *See Amchem,* 521 U.S. 591, 138 L. Ed. 2d 689; *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998). *See also* Judge Britt's order in *In Re Stucco Litigation*, 175 F.R.D. 210 (E.D.N.C. 1997). On the other hand, technology has made the coordination of large litigation across state lines more manageable for class counsel, encouraging the consortium approach to what would have heretofore been treated as a nationwide class action in federal court. The possibility of the megafee created by the establishment of the megafund serves to encourage the consortium approach as well. As will be noted later, the risk can also be spread more widely among counsel. Consortium litigation also increases the settlement leverage available to class counsel since it can dramatically increase the risks for defendants. Strong claims under one state's laws can be leveraged with weaker claims in other states. Consortium litigation often levels the playing field as far as resources available to plaintiffs and defendants.

{59} Consortium litigation also places new burdens on state court systems that are not experienced or equipped to handle such massive litigation and presents attorney fee issues with which state courts have not previously had to deal. Because their jurisdiction is limited, state courts have far more difficulty managing and controlling consortium litigation than federal courts. State court endorsements of nationwide class action settlements are far more susceptible to challenge in other states than federally endorsed settlements because each state will naturally and rightfully guard the interests of its citizens and insure that they are not abridged by other state courts.

{60} The most difficult problem raised by consortium litigation is the heightened equitable scrutiny required to protect the interests of absent class members. In the typical class action, absent class members have their interests represented by parties and attorneys that they have not selected. Class representatives and their counsel must not have a conflict of interest if they are to adequately and fairly represent absent class members. The additional blending of the state class members' claims with claims of class members or individuals in other states adds another layer of difficulty. Now, absent class members have the added worries that their claims might be compromised or the amount of their attorney fees from a common fund affected by claims of other parties in other jurisdictions. While there can be many similarities in the causes of action and proof required to establish liability, state laws differ in many respects. Statutes of limitation and repose are good examples that are particularly applicable here. The potential for conflicts of interest are patent, not latent, and the use of a lodestar approach recognizing consortium time raises significant problems with respect to fairness for the settlement class members where only a portion of the consortium case is being resolved. Settlement class members could be unfairly treated or they could get a windfall depending on the situation in each case. In the typical case there is no one to represent the absent class members when these problems arise. Fee requests in partial settlements of consortium litigation require heightened scrutiny and the fees involved should be more closely aligned with the interests of and actual benefit to the settlement class members. Where necessary, counsel should be appointed to represent the absent class members in such fee petition situations.

{61} <u>Requisite skill</u> The complexity of consortium litigation requires a high degree of skill and dedication. Organizational skill is a prerequisite to management of a case of this sort. The case has required mastery of technical issues and information. The substantive law issues have been straightforward, but the procedural issues have been difficult. The case has also required constant attention to legal and technical developments. The defendants have fought vigorously to protect their interests and defend their positions, both procedurally and substantively. The case has required both trial level and appellate skills as well as mediation skills. Class counsel have been diligent and persistent in their efforts on behalf of class members and demonstrated a high degree of skill and dedication in their representation.

{62} <u>The likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer</u> This is not a case in which acceptance of this representation would create a conflict preventing class counsel from representing parties they might otherwise serve. The possibility, if not the likelihood, exists that development of expertise and a reputation in connection with synthetic stucco issues would lead to other work, either in cases representing individual homeowners or in class actions in other jurisdictions. The sole preclusion effect in this case stems from the amount of time involved in properly representing the class. Both Mr. Shipman and Mr. Blount have filed affidavits detailing the time commitment to this case that prevented them from performing services for and billing other clients.

{63} <u>The customary fee charged in the locality for similar legal services and whether the fee is fixed or contingent</u> Whether the fee is fixed or contingent is less significant in this type of case. In class actions, the absent class members have not chosen their attorney and have had no chance to negotiate a fee arrangement. They do not get to choose whether they would pay for the involvement of counsel from outside the state and whether or not their interest would be tied to that of homeowners from other states. This is not a typical product liability or personal injury case in which an individual decides whether to share the risk and reward from individual litigation with the attorney and negotiates the fee arrangement. Rather, the Court should look to fee awards in similar cases, not negotiated fees in dissimilar cases. This is not a customary case. Nor does the court feel bound by any fee agreement with the class representatives. Absent class members should not be bound by fee agreements of class representatives, regardless of the degree of sophistication of the class representative.

{64} Consortium litigation poses one additional problem from a fee standpoint. It usually interjects into the fee determination the evaluation of hourly rates charged by out of state attorneys. Those rates may or may not be the same as the hourly rates normally charged by North Carolina attorneys for the same services. It is difficult for a state court to evaluate the normalcy of fees charged in other jurisdictions. The only safe harbor for trial courts is to evaluate fee requests on the basis of what lawyers in their specific jurisdiction would charge for similar services. After all, it would be a highly unusual situation that required use of out of state counsel because there was not a lawyer in North Carolina who was ready, willing, and able to handle a particular type of litigation. Nor should North Carolina residents who did not participate in the selection of counsel be automatically bound to pay rates that might be justified in some other jurisdiction, but not in North Carolina. Out of state counsel are not conscripted into representing North Carolina residents, but do so voluntarily. In some instances, their involvement may even result from an agreement between consortium counsel which ends disputes among counsel. Their services should be evaluated on the basis of what similarly situated North Carolina lawyers would charge on an hourly basis. The best source for that information is the Annual Survey prepared by the North Carolina Bar Association. In this case, class counsel have not provided the court with detailed information on their hours or hourly rates, insisting instead on a consortium approach to the determination of attorney fees. The court has used what information class counsel have supplied as a check against its fee determination in this case with the belief that the information supplied represents the maximum possible lodestar and that the fee award, if based solely on rates applicable in North Carolina, would be reduced from the lodestar proffered by class counsel. The Court has taken into consideration the reality that industry wide, multiple jurisdiction litigation carries with it more time and expense than would be incurred if the litigation were pursued on a single state, single defendant basis.

{65} <u>The time limitations imposed by the client or circumstances</u> The principle time limitation imposed by this litigation has been the fact that the claims of class members involve serious problems with their personal residences. In order to assess and evaluate what to do about possible problems associated with the use of synthetic stucco, homeowners need answers and a prompt resolution of their claims. Class counsel have been under persistent and continuous pressure to get this case tried or resolved.

{66} <u>The nature and length of the professional relationship with the client</u> This factor is of little relevance in this situation.

{67} <u>The experience, reputation and ability of the attorneys</u> In this case the court has found the skills, reputation and abilities of counsel to be excellent. Lead trial counsel are experienced attorneys, and other counsel have brought expertise to the resolution of many problems inherent in the settlement process. The experience and ability demonstrated by class counsel have been of high quality.

{68} <u>The amount involved and the results obtained</u> The Court has already discussed many of the facts relevant to this factor. A summary of the key facts follows. This was a good settlement that mirrored the benefits being obtained from EIFS manufacturers in the individual lawsuits against contractors, EIFS manufacturers, and others. Class counsel should be credited for creating the insured fund and early access to relief for homeowners. The settlement negotiated did contain some unique and beneficial terms for class members. The waiver of statutes of limitation and repose and the agreement that claims could be pursued against Settling Defendants if the fund was exhausted were unusual and expanded the potential benefits.

{69} The real benefit to the settlement structure negotiated by class counsel is still open to question, as is the full amount of the benefits that will be claimed. The nature of the settlement structure and the response thus far indicate that class counsel deserve to be paid for the time and expense incurred, but that the awarding of any premium for their efforts should be aligned with the actual receipt of benefits by settlement class members.

{70} The Court's determination of an appropriate fee may also be impacted by the result of the remaining portions of this litigation. If class counsel prevail against the other, larger defendants, the possibility of creation of a megafund exists. That would implicate the use of lower percentage rates in awarding fees against a larger total fund. If no other recovery is achieved for other homeowners, the Court's view of the quality of this settlement may change for the better. The Court should also insure that, if there are future judgments against other defendants, the Settling Defendants are not treated less favorably than defendants who fight to the bitter end. These Settling Defendants have come forward and attempted to reach a compromise resolution that is beneficial to homeowners. This partial settlement dictates that some caution be used in making a final determination of the full fee at this point. That is a factor that should be considered in partial settlements in industry wide litigation in multiple jurisdictions. It should not be ignored.

{71} <u>Risk</u> This is not a case about whether or not there would ever have been a determination of liability on the part of Settling Defendants. The multitude of individual cases combined with what was at stake for homeowners assured that the liability issues would be litigated. What this case has been about is (1) whether or not that liability would be determined on an individual basis in what defendants refer to as "residential construction" cases or on some broader basis that would obviate the necessity of proving liability on the part of EIFS manufacturers in each of the individual cases, and (2) whether or not EIFS manufacturers could be held liable for the full amount of damages, rather than a prorated share created when responsibility is allocated among all the participants in the construction process found liable. The key risk, then, consisted of establishing a cause of action pursuant to which all EIFS manufacturers could be held liable without regard to the actions of contractors or others in the construction process. That was and remains a significant risk. This settlement was a compromise of that risk which the Court believes was beneficial to the settlement class members. It assured homeowners at least partial reimbursement for any damage to their homes while leaving them free to pursue claims against others who might also be responsible for the problems associated with the use of synthetic stucco on their homes. The risk also existed and still exists that there will be a determination that EIFS manufacturers are not liable under any theory.

C.

{72} Having considered the benefits to the class, the structure of the settlement, the hours and expenses incurred by counsel on behalf of the class and the other factors set forth above, the Court has devised a fee payment plan designed to align the fee with the structure of the settlement and equitably correlate the fee

with the actual and potential benefits to the class. At the same time, the payment plan permits the Court to change the fee as this litigation and the settlement process evolves, rather than guessing about what may happen. It also takes into consideration the possibility that class counsel may expend significant hours in further representation of the settlement class. It gives the Settling Defendants the incentive to see that the class counsel do not have to spend significant time on the case and incentive to hold down costs other than payment of benefits. It provides incentive for class counsel to see that the maximum claims are made against and paid by the Settlement Fund as soon as possible. Since this is a partial settlement of an industry wide case involving multiple jurisdictions, neither a straight percentage of the fund nor a lodestar method is particularly useful. A multiple factor approach correlating the fee to the actual benefit received by the class is the more equitable basis for the fee award. Under the terms of this Order, class counsel will receive approximately twenty percent (20%) of the first eleven million dollars paid out of the fund. Whether that percentage should be raised or lowered when distributions reach eleven million dollars should be determined at that time, when the situation is more fully developed. Class counsel get the benefit of an initial payment which covers their maximum lodestar, and, if the settlement does not result in a payout reaching eleven million dollars, their percentage may actually be higher than thirty percent of the actual benefits paid out.

{73} Based upon the foregoing, it is hereby **ORDERED:**

1.
   1. **Class counsel shall be awarded an initial fee of one million dollars ($1,000,000.00) plus interest at the statutory rate from the date of the final order approving settlement to date of payment.**
   2. **Beginning August 1, 1999, class counsel shall be paid monthly from the fund a supplemental fee consisting of an amount equal to ten percent (10%) of the total amount paid out of the fund for the previous month for benefits to the class members and costs of administration, exclusive of class counsel's fees.**
   3. **When the total amount paid out of the fund for benefits and costs of administration (exclusive of attorney fees) reaches eleven million dollars ($11,000,000.00), class counsel or Settling Defendants may move the Court for a change in the percentage of the supplemental fee based upon the circumstances existing at that time. The Court also reserves the right to change the supplemental fee at that time or any other time on its own motion.**
   4. **Nothing provided herein shall prevent class counsel from moving for a modification in the fee if the amount of time and expense required in the future to represent the interests of settlement class members becomes excessive or burdensome or Settling Defendants take any action which results in an unreasonable demand on class counsel. In moving for a modification, class counsel shall present detailed time records showing the time, attorney, hourly rate and description of services to support the modification.**
   5. **The Court retains jurisdiction over the fee process in order to provide such other and further relief as may prove just and proper.**

This 14th day of July, 1999.