IN RE STUCCO ATTORNEY FEES PETITIONS, 2000 NCBC 7

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| COUNTY OF NEW HANOVER | SUPERIOR COURT DIVISION |

| IN RE SENERGY AND THORO CLASS ACTION SETTLEMENT | 96 CVS 5900 |
|---|---|
| IN RE PAREX, INC. EIFS LITIGATION | 96 CVS 5901 |
| IN RE STO CORP. EIFS LITIGATION | 96 CVS 5902 |
| IN RE W.R. BONSAL COMPANY EIFS LITIGATION | 96 CVS 5903 |
| IN RE CONTINENTAL STUCCO PRODUCTS EIFS LITIGATION | 96 CVS 5904 |
| IN RE DRYVIT SYSTEMS, INC. EIFS LITIGATION | 96 CVS 5905 |

## ORDER ON PETITION FOR ATTORNEY FEES

{1}     This matter is before the Court on (1) the petition for attorney fees and expenses filed by class counsel in connection with the partial settlement of this class action involving Defendants Parex, Inc. ("Parex"), Sto Corp. ("Sto"), W.R. Bonsal Co. ("Bonsal"), Continental Stucco Products ("Continental"), and Dryvit Systems, Inc. ("Dryvit") (collectively "Settling Defendants") and (2) the motion for reconsideration of the Order on Petition for Attorney Fees issued by this Court in the matter of *In re Senergy and Thoro Class Action Settlement*, 1999 NCBC 7 (No. 96 CVS 5900, New Hanover

County Super. Ct. July 14, 1999) (Tennille, J.). The Court has previously approved the settlement of the class claims against Senergy, Inc. ("Senergy") and Thoro Systems Products, Inc. ("Thoro"), and the Settling Defendants. For the reasons set forth below, the Court issues an award of $9,271,500 in attorney fees and expenses to class counsel to compensate them for their efforts in connection with the recent agreements with Settling Defendants and modifies its earlier fee award in the Senergy settlement.

*Shipman & Associates, L.L.P., by Gary K. Shipman and Carl W. Thurman III; The Blount Law Firm, P.L.L.C., by Marvin K. Blount Jr.; Doffermyre, Shields, Canfield, Knowles & Devine by Everette L. Doffermyre; Cohen, Milstein, Hausfeld & Toll, P.L.L.C., by Gary E. Mason; Heins Mills & Olson, P.L.C., by Kent M. Williams; and The Alexander Law Firm, by William M. Audet, for Settlement Class Members.*

*Moore & Van Allen PLLC, by Curtis J. Shipley and Daniel G. Clodfelter, for Defendant W.R. Bonsal Company.*

*Patterson, Dilthey, Clay & Bryson, L.L.P., by Stuart L. Egerton, for Defendant Continental Stucco Products.*

*Turner, Padgett, Graham & Laney, P.A., by Steven W. Ouzts; Edgar & Paul, by Karl F. Edgar, for Defendant Parex, Inc.*

*Womble Carlyle Sandridge & Rice PLLC, by Robert E. Fields, III, Jerry S. Alvis, W. Andrew Copenhaver and F. Bruce Williams, for Defendant Dryvit Systems, Inc. and Defendant Sto Corp.*

*Turner, Padgett, Graham & Laney, P.A., by J. Kenneth Carter, Jr., for Defendant Senergy, Inc. and Defendant Thoro Systems Products, Inc.*

*Haynesworth, Marion, McKay & Guerard, by Moffatt G. McDonald, James B. Pressley, Jr., and William David Connor, for Defendant United States Gypsum.*

## I.

{2}     This action was brought on January 5, 1996 against nine defendants who represented the majority of manufacturers of synthetic stucco or Exterior Insulation and Finish Systems ("EIFS") in North Carolina and nationally. The case was certified as a class action by Judge Ernest B. Fullwood on January 9, 1996 and subsequently recertified by Judge Fullwood on September 18, 1996. Thereafter the case was assigned to the undersigned pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts. In April of 1998, class counsel reached a nationwide settlement with Senergy and Thoro ("Senergy Settlement"). The Senergy Settlement provided for an insured fund of

$20 million from which qualified homeowners would receive $4 per square foot of EIFS installed on their property. Former owners of a property on which Senergy or Thoro EIFS had been installed were entitled to a payment of actual damages up to $1,000. *See In re Senergy*, 1999 NCBC 7 at 6-9 (describing in detail the terms of the Senergy Settlement). The Senergy Settlement provided that class counsel could request up to thirty percent (30%) of the $20 million insured fund for fees and expenses. Thus, the amount awarded by the Court would be deducted from the pool of insured funds, thereby reducing the amount available to satisfy the claims of homeowners. In its Order dated July 14, 1999, this Court made the following provisions for payment of attorney fees and expenses:

1. Class counsel shall be awarded an initial fee of one million dollars ($1,000,000.00) plus interest at the statutory rate from the date of the final order approving settlement to date of payment.

2. Beginning August 1, 1999, class counsel shall be paid monthly from the fund a supplemental fee consisting of an amount equal to ten percent (10%) of the total amount paid out of the fund for the previous month for benefits to the class members and costs of administration, exclusive of class counsel's fees.

3. When the total amount paid out of the fund for benefits and costs of administration (exclusive of attorney fees) reaches eleven million dollars ($11,000,000.00), class counsel or Settling Defendants may move the Court for a change in the percentage of the supplemental fee based upon the circumstances existing at that time. The Court also reserves the right to change the supplemental fee at that time or any other time on its own motion.

4. Nothing provided herein shall prevent class counsel from moving for a modification in the fee if the amount of time and expense required in the future to represent the interests of settlement class members becomes excessive or burdensome or Settling Defendants take any action which results in an unreasonable demand on class counsel. In moving for a modification, class counsel shall present detailed time records showing the time, attorney, hourly rate and description of services to support the modification.

5. The Court retains jurisdiction over the fee process in order to provide such other and further relief as may prove just and proper.

1999 NCBC 7 at 73.

{3}     After the Senergy Settlement, this Court bifurcated the remaining claims of liability and damages and ordered separate trials for each of the remaining defendants on the issues of defective product design and failure to warn. On the eve of the trial of claims against Dryvit, settlement was reached with Dryvit, Parex and Continental. All trial dates were stayed, and the parties spent the next few weeks negotiating settlement terms with the remaining defendants interested in settling. By the end of 1999, class counsel had successfully negotiated settlement agreements with Sto and Bonsal. Class counsel were satisfied that, under all of circumstances of this litigation, the settlements were very favorable to the class, were fair, reasonable, and adequate,  and were in the best interests of class

members. Accordingly, the settlements were formally submitted to the Court. The Court granted the request for preliminary approval of the settlements and authorized notice to be directed to the class, with a hearing to be held to consider final settlement approval and related matters and to give class members an opportunity to present their views. On March 17, 2000, the Court held a fairness hearing at which it heard and considered objections to the proposed settlements. At the close of the hearing, the Court granted final approval of the settlements reached with Settling Defendants.[fn1]

{4}     The basic terms of the proposed Settlements with Dryvit, Parex, Continental and Bonsal provide that claimants will receive $6 per square foot of EIFS installed on their property.[fn2] Former owners who did not reclad their former homes are eligible to receive payment of up to $1,000 for actual damages. With the exception of Continental[fn3] and Sto[fn4], there is no aggregate limit on the payments to be made by each defendant. To qualify for payment, a claimant must provide documentation from an independent inspector (or, if a former owner, other appropriate documentation) demonstrating two or more moisture readings of greater than twenty-five percent (25%) from separate water sources, or two (2) square feet of wall with evidence of loss of structural integrity of sheathing.

{5}     Plaintiffs and each of the Settling Defendants have agreed to an exact or a maximum amount to be paid in attorneys' fees upon Court approval. Parex has agreed to pay class counsel $1.75 million for attorneys' fees, costs and expenses. Bonsal has agreed to pay $750,000 for attorneys' fees, costs and expenses. Continental has agreed to pay $571,500 for attorneys' fees, costs and expenses. Dryvit has agreed to pay up to $6 million for attorneys' fees, costs, and expenses, as determined by the Court. Finally, Sto has agreed that class counsel may apply for thirty percent (30%) of the $2.5 million settlement fund for attorneys' fees, cost and expenses, or $750,000.[fn5]

{6}     In an Interim Order dated March 24, 2000, this Court approved the agreed upon amount of attorney fees and expenses in connection with the settlements with Parex ($1.75 million), Continental ($571,500), and Bonsal ($750,000). In addition, the Court approved an award of $5.7 million as a part of the Dryvit settlement and approved a distribution from the Sto settlement fund of $500,000 for attorney fees and expenses. After reviewing the history of the claims made against the Senergy Settlement fund and the terms of the other settlements, the Court decided to modify its previous award. Specifically, the Court approved a total award of $3 million from the Senergy settlement fund and, after distributions from the settlement fund have reached $15 million (inclusive of attorney fees and expenses), an additional payment of twenty-five percent (25%) of any direct distributions to class members (excluding administration costs) until the initial fund is exhausted.

## II.

{7}     Class counsel have requested the Court to award $9,821,500 in fees and expenses to compensate them for their efforts associated with pursuing this action and reaching an agreement with Settling Defendants. The fee request submitted with respect to Settling Defendants is different from the

request submitted in the Senergy Settlement in that the fees and expenses to be paid to class counsel were negotiated by the parties as a part of the overall settlement. Because each of the Settling Defendants have already agreed upon the exact or maximum fees and expenses to be paid to class counsel, none of the defendants have objected to class counsel's fee request. Thus, the primary concern of this Court in considering class counsel's petition is whether the fees and expenses are reasonable in light of several factors. In its Order awarding attorneys fees and expenses in the Senergy Settlement, this Court found that the factors enumerated in the Model Rules of Professional Conduct provide an appropriate check for determining the reasonableness of a given fee award. *See In re Senergy*, 1999 NCBC 7 at 48-71; *see also* Model Rules of Professional Conduct Rule 1.5(b). The overriding concern of this Court is the reasonableness of the fee award in light of the projected benefit conferred on the class. The Court uses as its starting point the amounts agreed upon by the parties during settlement. For the reasons stated below, this Court has decided to slightly reduce the maximum negotiated fee with respect to Sto and Dryvit but otherwise award class counsel the amounts agreed upon during their negotiations with the other defendants. Accordingly, this Court finds that a total award of $9,271,500 in fees and expenses (exclusive of the Senergy fee award) is reasonable under the Rule 1.5(b) factors.

{8}     Time and labor required. Class counsel has submitted to the Court detailed documentation of the fees and expenses they have incurred in pursuing this action. The Court appreciates the thoroughness and clarity with which the information was compiled and presented. This litigation has required substantial commitments of time and labor from class counsel and their staff. Class counsel has devoted more than 60,000 hours of the professional time of lawyers and legal assistants in pursuit of relief for the Class. In addition, class counsel has expended over $2.95 million in expenses attributable to this litigation. Class counsel spent a considerable amount of time and expense defending a motion for summary judgment and preparing for trial while concurrently engaging in settlement negotiations.

{9}     In connection with their petition for an award of attorney fees and expenses, class counsel submitted to this Court charts detailing their fees under a lodestar approach. Class counsel computed a lodestar fee amount for each defendant based on a survey of rates charged in North Carolina.[fn6] In addition, class counsel computed a "time multiplier"[fn7] to reflect the ratio of the lodestar fee to the requested award. Class counsel provided this information in an effort to show that the amount each defendant has agreed to pay is reasonable.

{10}    Specifically, the class counsel has requested, and Parex has agreed to pay, $1.75 million in fees and expenses. The total fees and expenses incurred with respect to defendant Parex, using average North

Carolina rates (the lodestar amount) amounts to $1,622,233.47. Thus, the requested fee represents a 1.11 multiplier applied to the Parex lodestar amount, thus indicating that the fee is reasonable. Similarly, the fees and expenses agreed upon by Continental and Bonsal are reasonably close to the lodestar fee amount associated with these defendants. The fee requested with respect to Continental ($571,500) represents the application of a multiplier of 1.03 to the total lodestar value of work relating to Continental ($560,373.03), and the fee requested with respect to Bonsal ($750,000) represents the application of a negative multiplier of .92 to the total lodestar value of work relating to Bonsal ($801,478.54). The Court accepts class counsel's rationale that the comparison of the agreed upon fee to the lodestar fee supports a determination that the fee request with respect to Parex, Continental and Bonsal is reasonable.

{11}   Unlike the agreements with Parex, Continental and Bonsal, in which the parties agreed to a set fee, the agreement with Dryvit provided for a maximum payment for attorney fees and expenses with the fee to be set by the Court. Specifically, the Dryvit agreement provided that class counsel would submit to the Court a request for attorney fees and expenses not to exceed $6 million. The $6 million requested by class counsel represents the application of a multiplier of 1.27 to the total lodestar value of work relating to Dryvit ($5,046,100.35). This Court has decided to set the fees awarded to class counsel in connection with the Dryvit settlement to $5.7 million. The fee is based on an application of the additional factors discussed below. In addition, the fee award is in line with the multipliers discussed above. Specifically, an award of $5.7 million represents a multiplier of 1.12 to the total lodestar for work relating to Dryvit.

{12}   Finally, the Sto agreement provided that class counsel would apply for thirty percent (30%) of the settlement fund, or $750,000. Although this figure represents the application of a multiplier of .92 to the total lodestar value of work relating to Sto ($797,588.88), this Court has decided to set the fees awarded to class counsel in connection with the Sto settlement at $500,000. As will be discussed further below, the decision to set the fee award with respect to Sto at that amount is based on the limited benefit to the class as a result of unique limitations in the settlement agreement which were necessitated by Sto's financial condition. Because the Sto fund is limited, the Court has tried to arrive at a fair allocation of that fund between class members and class counsel.

{13}   Novelty and difficulty of questions involved and skill required. The time and labor required is just one factor relevant to the consideration of whether the fees and expenses awarded in this case are reasonable. Among the additional factors listed in Rule 1.5(b) is the novelty and difficulty of the questions involved and the skill required. In *In re Senergy*, this Court noted that central to this case are

straight forward issues of design defect and failure to warn. Much of the complexity in this case has resulted from plaintiffs' industry-wide approach, in addition to defendants' efforts to limit their liability by joining third parties. Mass tort litigation brings with it a host of procedural difficulties which contribute to the complexity of the case and which require great organizational skills on the part of counsel. However, class counsel should not benefit from a positive adjustment to the fee award based on this factor when much of the complexity was created by class counsel's litigation strategy.

{14} Subsequent to the Senergy Settlement, the complexity of this case was compounded by questions of substantive law. In defense of the motion for summary judgment, class counsel had to address the applicability of the economic loss doctrine in a class context. In addition, class counsel were forced not only to formulate a workable trial plan but also to deal with challenges such as the conflicting substantive requirements of the consumer fraud claims and the limitations on technical evidence imposed by *Daubert* and other legal precedents. Thus, class counsel faced novel and difficult questions of both a procedural and a substantive nature and were required to demonstrate a high degree of skill. The fee award reflects this Court's opinion that throughout this litigation, class counsel have continually demonstrated a high degree of skill and dedication to class members.

{15} <u>Preclusion of other matters.</u> This Court is aware that class counsel have fully committed themselves to a successful resolution of this litigation. Such a commitment certainly has prevented class counsel from focusing their energies on other matters. However, this Court also recognizes that class counsel will likely be able use their work product in other litigation. Thus, while the time commitment has been great, there is a strong likelihood that class counsel may derive additional benefits from the labor expended in this litigation. Accordingly, in this case, the factor of preclusion of other matters does not have as significant a weight in the determination of a reasonable fee.

{16} <u>The customary fee charged in the locality for similar legal services, and whether the fee is fixed or contingent.</u> As an initial matter, the Court notes that the comparison of the lodestar fees to the agreed upon fees discussed above indicates that class counsel's fee request closely reflects the average customary fees charged in North Carolina.

{17} As this Court noted in *In re Senergy*, the fact that the fee is contingent is less significant in a class action because absent class members have had no chance to negotiate a fee arrangement. "This is not a typical product liability or personal injury case in which an individual decides whether to share the risk and reward from individual litigation with the attorney." *In re Senergy* 1999 NCBC 7 at 63. This Court recognizes that the fee award should, to some degree, reflect the risk of loss assumed by class counsel.

{18}   Amount involved and results obtained.  The amount involved in this case was large, and the result obtained for the class is very favorable, both factors thus supporting the fee awarded to class counsel. As described more fully above, class members generally will receive $6 per square foot of EIFS, on a lesser showing of damage required than in the Senergy Settlement and in a streamlined claims process that allows North Carolina homeowners to quickly realize these benefits.  With the exception of the Continental and Sto settlements, there is no cap on each defendant's aggregate liability.  The statutes of limitations and repose have been waived or tolled for those who otherwise qualify, and homeowners' rights against third parties are not being settled or compromised.  Class counsel also separately negotiated the issue of the attorney fees and expenses to be paid by defendants which, with the exception of Sto, are to be paid in addition to and separate from the amounts committed to the payment of class members' claims.

{19}   As mentioned above, this Court determined the fee to be paid out of the Sto settlement fund in light of the limited benefit to Sto homeowners.  The Sto agreement provided that class counsel would seek attorney fees and expenses up to $750,000.  The award of attorney fees and expenses with respect to Sto is to be paid out of the settlement fund, thereby reducing the amount available to satisfy claims of class members whose homes are clad with Sto EIFS.  In addition, Sto's current financial situation made it difficult to arrive at a settlement which is favorable to homeowners.  While the Court believes that the settlement with Sto is fair and reasonable under the circumstances, it recognizes that the settlement provides a limited benefit to Sto homeowners.  Instead of the $6 per square foot agreed to by the other Settling Defendants, Sto homeowners will share in the fund on a pro rata basis.  Because of the limited benefit to Sto homeowners, the Court has decided to limit the fee award in connection with the Sto settlement to $500,000 in order to maximize the total amount available to satisfy Sto claims.

{20}   In sum, the agreements reached with Settling Defendants is an improvement upon the settlement obtained from Senergy.  However, the actual benefit to the class is undetermined.[fn8]  The Court's award is intended to reflect this uncertainty while at the same time to acknowledge that the results obtained in this litigation have been very favorable to homeowners.

{21}   Time limitations.  The time limitation imposed by this litigation stems from the fact that the claims of the class members involve serious problems with the structure of their homes.  Class counsel have been under constant pressure to come to a resolution in this case. The class action not only eliminated the delay involved in homeowners pursuing individual actions, but also the settlements eliminate the delay that would be associated with a lengthy trial against each manufacturer.

{22}    The experience, reputation and ability of the attorneys.  The Court commends counsel for the skill and ability they have demonstrated.  The skills, reputation, and ability of counsel are excellent.

{23}    Risk assumed by class counsel.  When class counsel took on this litigation on a contingency fee basis, they assumed a significant amount of risk.  As the possibility of trial became great, the risks inherent in this litigation increased.  Class counsel invested a significant amount of time, skill and expense in pursuit of this litigation.  Several legal issues such as class certification, the applicability of the economic loss rule, and the admissibility of expert evidence created uncertainty about the ultimate outcome of this case.  Despite the risks involved in this litigation, class counsel remained committed to achieving a favorable outcome for class members.  Ultimately, the settlement alleviated much of the risk to class counsel while ensuring recovery for class members.

**B.**

{24}    In addition to the reasonableness factors discussed above, the Court wishes to note several improvements from the Senergy Settlement and to compare the current settlement with the mediated settlement results in the individual homeowner cases.  Together, these considerations support the fee award with respect to Settling Defendants.

{25}    First, with the exception of Sto, the agreements with Settling Defendants provide for more money per square foot.  The Senergy Settlement provided for a cash payout of $4 per square foot in limited circumstances.    The Dryvit, Parex, Continental, and Bonsal Settlements each provide for $6 per square foot – a fifty percent (50%) improvement over the Senergy Settlement.  Second, the damage requirement is easier to meet in this settlement.  Under the Senergy Settlement, claimants must prove extensive damage to qualify for the cash benefit.  Senergy claimants who make a lesser showing of damage qualify only for a repair and warranty program.   The current settlements, however, provide a cash benefit for the "lesser" showing set forth in the Senergy repair and warranty program.  No additional showing is necessary.

{26}    Third, the settlement provides for easier product identification criteria.  Compared to the Senergy Settlement, claimants under the current settlements have more ways to show product identification.  In addition, the information considered in determining product identification where there is not a *prima facie* showing is more liberal, and the product identification process moves more quickly under these settlements than under the Senergy Settlement.  All of these benefits will make it easier, quicker and more convenient for homeowners to file claims, show that they qualify and receive their payments.

{27}    Also, there are no caps or limitations.  The Senergy Settlement has an overall cap of $20 million to

be paid to class members, after which Senergy can elect either to stay in the settlement and pay additional claims, or face further litigation from unpaid class members. Under the current settlements (with the exception of Continental and Sto), there is no limit on the total amount the Settling Defendants must pay. Thus, every claimant who qualifies will receive the full benefits of settlement, regardless of the number of claims received, and regardless of the total cost of the settlements to the Settling Defendants.

{28} In addition, attorney fees are agreed to and are counted separately. In the Senergy Settlement, the parties were unable to agree with respect to attorney fees. Because fees and expenses counted against the $20 million limit on Senergy's settlement liability, there was a substantial question regarding not only the amount that would be deducted from the overall benefit made available to class members but also and whether an attorney fees award would bring Senergy significantly closer to the limit. No such question exists here. In each settlement, attorney fees have been agreed to (with either a negotiated amount or a maximum) and, except for Sto, the fees approved by the Court will not be counted against, or in any way diminish, the overall benefits being provided to class members under the settlements.

{29} Finally, and perhaps most significantly, the Court is persuaded that the latest result achieved for the class members meets or exceeds the results being obtained for individual homeowners in other cases. Many homeowners opted out of the class or pursued individual cases against other parties in addition to the defendant EIFS manufacturers. In the typical individual case, claims are asserted by the homeowner against multiple defendants including contractors, subcontractors, EIFS manufacturers and others. The overwhelming majority of those cases have been settled in mediation. All the various defendants contribute toward the total settlement, with the EIFS manufacturer paying a share. Class counsel have represented to the Court, and defendants' attorneys have confirmed, that the amounts agreed to in the latest class settlements match or exceed the amounts being contributed by Settling Defendants in those individual cases. That is particularly true of the net settlement since class members do not have attorney fees deducted from their settlement amounts. The same does not hold true for individual homeowner litigants, who will bear that expense. Thus, the Court believes that these settlements significantly advanced the interests of class members.

### C.

{30} One additional consideration has influenced the Court's determination of the fees in this case. Unique to this litigation is the uncertainty inherent in several factors that could influence the actual value of the settlement. First, the number of potential claimants is not at all clear. The opposing

parties have never agreed on the number of homes which are covered with EIFS. Second, the potential problems resulting from the use of EIFS may vary widely depending on the location of the home, where EIFS was applied, the weather in the area, the competency of the applicator and other subcontractors, the other building materials used, the maintenance performed by the homeowner and numerous other factors. Third, many of the claims may have already been resolved. Homeowners possessed claims against other responsible parties, including their contractors. The problems may have been addressed under warranties without recourse to claims against EIFS manufacturers. Hundreds of homeowners have opted out of the class. Presumably these were people with larger homes and significant problems. Many homeowners may simply choose not to pursue a claim. Some may never know they have a claim or realize they have a problem. Some homes may not qualify because of lack of damage. In short, the extent of the unresolved problems and the benefits that will be paid out is impossible to calculate with certainty at this point.

## III.

{31} The Court turns to the motion for reconsideration filed by class counsel in connection with the award of fees in *In re Senergy*. In its Order on Petition for Attorney Fees, this Court conducted a multiple factor analysis to arrive at a reasonable fee. Under this analysis, the Court first considered the actual benefit to the class and then analyzed the fee request in light of several reasonableness factors. *In re Senergy*, 1999 NCBC 7 at 48. The Court determined that it would be appropriate to devise a fee payment plan which would permit the Court to change the fee as the litigation and the settlement process evolves. *Id.* at 72. Accordingly, the Court awarded class counsel an initial fee of $1 million. *Id*. at 73. This initial payment covered class counsel's lodestar amount with respect to work attributable to the Senergy Settlement. *Id.* The Order further provided that class counsel would be paid monthly from the fund a supplemental fee consisting of an amount equal to ten percent (10%) of the total amount paid out of the fund for the previous month for benefits to the class members and costs of administration, exclusive of class counsel's fees. *Id.* The Court recognized that as more information became available and as the benefit to the class became more certain, it would be appropriate to revisit the fee issue. *Id.* Therefore, the Order allowed class counsel to petition the Court to alter its award at a later time. *Id.*

{32} The structure of the Court's order would have resulted in class counsel receiving approximately $2 million or twenty percent (20%) of the first $10 million paid out of the fund. There were a number of reasons for the decision to structure the fee award in that manner at that time. The case was not complete and the fee award needed to be ultimately determined in comparison and conjunction with

the other outcomes. The Court assumed that by the time $10 million had been paid out, there would be some clear direction in the remaining litigation. The value of the settlement was not clear and would only become apparent with time and through experience with the claims process. The structure of the settlement left questions open with respect to the value to claimants and the effort and time it would take to make the claims process work. The requirements to qualify for a payment were untested. The issues of how repairs and warranties would work and how those repairs and warranties would be valued were uncertain. As the Court has indicated, percentage awards are reduced as the size of the settlement increases. If, as has proven to be the case, there were other settlements and a larger fund created, Senergy class members might have ended up paying a larger percentage on a cheaper settlement. It would be easier to adjust the fee upward than downward. For all those reasons, the Court elected to tie the fee more directly to the actual benefit being received by class members and to leave itself some flexibility. Against that background, the Court turns to the specific grounds for reconsideration raised by class counsel.

### A.

{33} In its motion, class counsel takes the position that the Court incorrectly rejected counsel's request for an award in the amount of thirty percent (30%) of the $20 million settlement fund. As a check against this $6 million fee, class counsel suggested that the Court could consider an aggregate lodestar amount of approximately $11 million, which accounted for time spent litigating claims against all defendants.

{34} Class counsel asserts that this Court erred by failing to apply "generally-accepted methods for determining attorney fees in common fund class actions." (Mem. in Sup. of Mt. for Reconsid. at 1.) The Court erred, according to class counsel, by failing to adhere to fee guidelines in federal court cases. Class counsel takes the position that because there is no North Carolina authority on the issue of which methodology is proper, the state court "must look to federal cases for guidance." (*Id.* at 11.) In support of this assertion, class counsel cites *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 282-84, 354 S.E.2d 459, 465-66 (1987). As an initial matter, this Court does not read *Crow* to require that a court follow federal law when selecting which methodology to use to determine an award of attorney fees. In *Crow*, the court had to determine the proper definition of a "class" under Rule 23 of the North Carolina Rules of Civil Procedure. *Id.* at 277, 354 S.E.2d at 462. In interpreting Rule 23, the *Crow* court noted that the rule was drafted with an eye toward the federal rule providing for class actions. *Id.* at 278-79, 354 S.E.2d at 463. Therefore, the court considered federal authority in determining the requirements of a class under North Carolina Rule 23. The determination of a reasonable attorney fee,

which is discretionary in nature, is clearly distinguishable from the issue of statutory construction presented in *Crow*. In addition, nowhere in the *Crow* opinion is there a general directive that where there is no North Carolina authority on a legal issue related to class actions a court <u>must</u> be guided by federal authority. Class counsel's position is legally erroneous and unsupported by North Carolina case law.

{35} Regardless, the Court's Opinion made it clear that the Court looked to federal law for guidance in determining the appropriate methodology. Although the Court reviewed federal case law on the determination of attorney fees in common fund cases, it found no prevailing methodology. In fact, this Court stated in its opinion that

> [f]ederal courts have applied various methodologies to the determination of fee requests, and there is no settled approach. Thus, the federal decisions offer much information, but little certainty with respect to choice of methodology . . . . This court has concluded that the majority of federal circuit courts now leave it to the trial court's discretion to choose between the lodestar and percentage methods or some hybrid thereof in determining fees in common fund cases.

1999 NCBC 7 at 22. Therefore, in making a determination as to the attorney fees to be awarded to class counsel in connection with the Senergy Settlement, this Court considered various methodologies used by the federal and state courts to determine reasonable attorney fees in common fund cases.

{36} First, the Court discussed the percentage of the fund approach. While the Court acknowledged the efficiency of this approach, it determined that the method presented a significant disadvantage, namely its potential for abuse. This Court declines to repeat the analysis contained in its previous order; however, the Court wishes to reiterate two primary concerns presented by an application of the percentage of the fund methodology to the facts in this case. First, the percentage of the fund method can result in the attorneys receiving a fee that bears no relation to the time spent or to the actual benefit to class members. Second, the percentage of the fund method is problematic where the determination of the fund itself is uncertain. The subsequent history of this case has proven that these are valid concerns. To date, approximately $6.04 million, or thirty percent (30%) of the Senergy common fund, has been expended for settlement of claims and administration expenses. Thus, the common fund of $20 million does not accurately reflect the actual benefit to the class members. This case presents a clear example of a situation where the request for a percentage of the fund is unreasonable in light of the actual benefit to the class.

{37} This Court also considered the lodestar approach. Class counsel argues that this Court "rejected the lodestar approach." A careful reading of the Order reveals this Court's opinion that while the lodestar approach is more difficult and time consuming, it may be used as a check on the

appropriateness of a fee set by a percentage of the fund. Accordingly, this Court used a lodestar fee as one relevant factor in determining a reasonable fee in this case. Specifically, the Court accepted class counsel's representation that $11,242,510 worth of attorney time had been spent litigating claims against *all defendants*. However, because Senergy represented approximately ten percent (10%) of the market share, the Court reduced the aggregate lodestar amount by ninety percent, arriving at a fee of $1,124,351. The Court noted the discrepancy between the $6 million requested by class counsel under a percentage of the fund theory and the lodestar amount of $1,124,351 which provided support for this Court's decision to award a fee which was significantly lower than the requested fee.

{38}    Finally, this Court recognized that several courts have adopted a hybrid, or multiple-factor approach. Part of the hybrid approach involves a comparison between the percentage of the fund and the lodestar amount for a given case. However, as this Court indicated, an additional "[p]art of the hybrid approach is a consideration of factors other than percentage of the fund and hours worked." Class counsel suggests that the hybrid approach is simply a comparison of the percentage of the fund and the lodestar methods, and that therefore this Court improperly "applied its own version of the 'hybrid approach' by analyzing the fee request in light of the reasonableness factors set forth in Rule 1.5(b) of the Rules of Professional Conduct." (Mem. in Sup. of Mt. for Reconsid. at 7.)

{39}    This suggestion indicates class counsel's misunderstanding of the case law adopting a hybrid approach. In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), the Fifth Circuit first applied a multiple-factor approach to determining court-awarded attorney fees. Specifically, the *Johnson* court determined a reasonable fee in light of the twelve factors currently reflected in the Model Rules of Professional Conduct. *Id.* at 717-19. Although the *Johnson* case involved a statutory fee award, the twelve factors enumerated by *Johnson* have since been applied in common fund cases. *See Shaw v. Toshiba Am. Info. Sys.*, 2000 U.S. Dist. LEXIS 2887 at *70-73 (E.D. Tx. January 28, 2000). Likewise, when the Third Circuit introduced the lodestar approach, in *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973), it adjusted the lodestar figure to account for certain factors such as risk involved and quality of work performed. In fact, regardless of whether the court is applying a lodestar or a percentage of the fund methodology, the award is commonly adjusted, based on the application of various factors, in an effort to arrive at a reasonable fee. *See Camden I Condo. Ass'n., Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991), *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988); *Lindy*, 540 F.2d at 112. *See also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242

(1985).

{40}    Class counsel goes even further to suggest that the federal courts have returned to a percentage of the fund methodology, citing *Dunkle*, 946 F.2d at 773.  The *Dunkle* court did note that the percentage of the fund method has increasingly gained favor in the courts; however, the court also indicated its agreement with the Tenth Circuit "that the *Johnson* factors continue to be appropriately used in evaluating, setting, and reviewing percentage of the fee awards in common fund cases."  *Id*. at 775.  While this Court recognizes that the percentage of the fund method is accepted in a number of courts, it believes that in certain cases an award based on a percentage of the common fund is clearly unreasonable.

{41}    In its Order, this Court used class counsel's request of $6 million, or thirty percent (30%) of the fund, as a starting point and then proceeded to explain, through an analysis of multiple factors, why such a request was unreasonable.  The overriding factor in this case was whether the amount of the total fund actually reflected the value or the benefit of the settlement to the class.  This Court explained that while the settlement undoubtedly benefited the class, "the common fund was not an accurate quantification of the actual benefit conferred."  1999 NCBC 7 at 44.  The Court based this determination on the monthly status reports it had received prior to its Order.  At the time of the Order, the reports indicated a substantial likelihood that the fund would not be exhausted.  The Court concluded that to "provide counsel with a fee of six million dollars without regard to the actual benefits conferred thus far could create a situation in which counsel benefited far more than the class members."  *Id*. at 45.[fn9]  This concern is what ultimately led the Court to structure the award to include an initial fee followed by monthly payments to class counsel of ten percent (10%) of the total amount paid out of the fund for the previous month for benefits to class members and costs of administration.  This Court further acknowledged that the potential dollar value of the fund is significant and a real benefit, and therefore allowed class counsel to move for a change in the percentage of the supplemental fee once the amount paid out of the fund reached $11 million.

{42}    After discussing the concern about the actual benefit to class members, this Court turned to an analysis of the *Johnson* factors, or the Rule 1.5 factors.  The first of these factors is the time and labor involved.  As stated above, class counsel provided an aggregate lodestar amount of over $11 million as a check against their $6 million fee request.  This lodestar amount included all time spent pursuing EIFS litigation against all defendants.  In its Opinion, the Court noted that class counsel did not file time records from which the Court could determine how much time was spent prosecuting the claim against the settling defendants.  However, the Court accepted class counsel's lodestar amount, while

reducing it to reflect Senergy's ten percent of the market share – yielding an amount that this Court believed a generous percentage of the total lodestar for the entire case.

{43}     Class counsel take issue with this Court's failure to request the submission of detailed time records. Class counsel quotes this Court as saying that "if there is anything additional that I feel like I need, I will certainly feel free to request it . . . ." (Mem. in Sup. of Mt. for Reconsid. at 5 citing Reporters Transcript 9/1/98 at 127.)   This Court reminds class counsel that it had the burden of convincing the Court that the fee request was reasonable.  Counsel was questioned at length about whether a $6 million award would be reasonable if the amount paid out of the fund to class members ended up being less than $6 million.  Class counsel had no reservations answering this question in the affirmative.  In addition, class counsel made the decision to provide this Court with an aggregate lodestar amount to justify its $6 million request.  Class counsel failed to convince this Court that its request was reasonable.  This Court acknowledges that detailed time records may have been helpful in determining an accurate lodestar amount against which to judge the reasonableness of the fee request; however, this Court did not feel compelled to make counsel's argument for them.  Instead, the Court positioned itself as an guardian of the interests of class members, class counsel, and the public, insuring that all interests were considered.  Again, it was class counsel's responsibility to provide the Court with any information that would have been helpful in determining whether the fee request is reasonable.  In any event, the Court used a multiple-factor analysis under which the lodestar was only one factor relevant to this Court's determination, and the Court believed it had sufficient information to make its analysis.

{44}     Finally, class counsel takes issue with this Court's reliance on the rationale in *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039 (Del. 1996), arguing that "[a]s a matter of law, this Court does not have the discretion to choose a methodology followed only by one court in a foreign state."   This statement not only misstates the law but also mischaracterizes this Court's decision.  First, the Court reminds counsel that there is no North Carolina authority on the issue of the proper methodology for awarding attorney fees in common fund cases.  Instead, North Carolina has left the determination of reasonable attorney fees in common fund cases to the sound discretion of the trial court.  *See Horner ex rel. City of Burlington v. Chamber of Commerce* , 236 N.C 96, 97-98, 72 S.E.2d 21, 22-24 (1952).  With no state authority on the issue, this Court turned to a review of federal case law.  As discussed above, this review led to the conclusion that there is no prevailing methodology among federal courts but that instead federal courts have used a variety of methods, including a multiple-factor analysis to determine a reasonable fee award.  Therefore, the Court also reviewed various state court decisions for

guidance as to how it might determine a reasonable and equitable fee.

{45}    The Court found the *Goodrich* analysis helpful, particularly its discussion of the divergent interests between class members and counsel with respect to the fee award, a divergence which necessitates a careful consideration of the actual benefit to the class.  This Court, in the exercise of its discretion and in accordance with its ability to consider persuasive authority from other jurisdictions when there is no primary authority, relied on two principles enunciated in *Goodrich*.  First, this Court determined that North Carolina appellate courts would agree with *Goodrich* that "'[t]he adoption of a mandatory methodology or particular mathematical model for determining attorney's fees in common fund cases would be the antithesis of the equitable principles from which the concept of such awards originated.'"  1999 NCBC 7 at 35, quoting *Goodrich*, 681 A.2d at 1050.  Second, this Court concluded that the *Goodrich* court's decision "permitting the trial court to consider the actual benefits received by class members is the correct approach and the one that would be adopted by the North Carolina appellate courts, at least under the circumstances of this case."  *Id.* at 37.   The *Goodrich* court was particularly concerned about a non-claim problem that created the potential that the common fund would not be exhausted.  While the Senergy Settlement does not pose the same non-claim problem, there is a concern about whether the class will actually receive a benefit in the amount of $20 million. Thus, *Goodrich* provided persuasive authority for limiting fees in light of uncertainty as to the actual total which would be paid to class members.

**B.**

{46}    This Court's legal analysis in *In re Senergy* does not require correction.  Class counsel's arguments presented in its motion for reconsideration were legally erroneous, unsupported by case law (state or federal) and based upon a failure to read or comprehend the Court's order.   Class counsel's original fee request in *In re Senergy* is an example of why the courts must carefully and closely review fee applications in common fund cases.  Class counsel and class members have conflicting interests in those situations.  The Court must protect not only the class members but also the public perception of the legal system.  Few things damage that perception as much as situations where the public perceives the system to have operated to benefit the lawyers more than their clients.  In light of the uncertainty as to the actual benefit to the class, this Court rejected a percentage of the fund methodology.   Instead, this Court applied a hybrid analysis whereby it used what it determined to be a reasonable lodestar amount as a benchmark and proceeded to analyze the reasonableness of this amount through an application of the remaining Rule 1.5 factors.[fn10]  This analysis led to the Court's determination that it would be reasonable to award an initial fee of $1 million, followed by supplemental payments.

{47}    At the time of the fee decision, this Court was not certain how much would be withdrawn from the fund. The Court now has the benefit of history from which it can make a more informed projection as to the total benefit to class members. Accordingly, this Court has decided to modify the fee award. The Court will approve a total award of $3 million from the Senergy settlement fund, and after distributions from the settlement fund have reached $15 million (inclusive of attorney fees and expenses), class counsel will be entitled to an additional payment of twenty-five percent (25%) of any direct distributions to class members (excluding administration costs) until the initial fund is exhausted.

{48}    Several changes warrant the Court's reconsideration of its initial fee determination. Experience has demonstrated the actual value of the settlement. The claims process did have problems which class counsel have addressed and resolved. The claims process has evolved to eliminate repairs and warranties and has resulted in cash payments to claimants. The requirements for payment have not proved to be too burdensome. The Senergy Settlement can be put in the context of the total settlement, and the Court is in a better position to make fee determinations now that the full picture is in place. The Court believes the revised fee award to be in line with the other fee awards approved. It seems clear that the fee award will not adversely affect the amount available to Senergy claimants since the fund is not likely to be exhausted.

{49}    This award is intended to reflect what the Court perceives to be the realistic benefit to the class, based on the projection that a total of $12 million will be paid in claims and expenses. This Court continues to believe that the $20 million insured fund does not accurately reflect the benefit to the class. However, the Court does recognize that class members have received a real benefit. After a consideration of the Rule 1.5 factors discussed at length in its prior opinion, this Court has decided that $3 million plus the possibility of additional payments is a reasonable fee in *In re Senergy* in light of the actual benefit to the class.

### Conclusion

{50}    In conjunction with the settlement of claims against Parex, Continental, Bonsal, and Dryvit, class counsel negotiated an exact or maximum amount for attorney fees and expenses, the payment of which will not be taken out of the respective settlement funds. With respect to Sto, the parties agreed that class counsel would seek a percentage of the settlement fund to compensate them for their fees and expenses. Class counsel have petitioned the Court for an award of attorney fees that is equal to the total of these negotiated amounts. The Court has reviewed the fee request in light of the

reasonableness factors enumerated in Rule 1.5(b) of the Model Rules of Professional Conduct. This review has led to the conclusion that the negotiated amounts in the settlements with Parex, Continental and Bonsal were in line with the lodestar amount for these defendants and were supported by the other Rule 1.5 factors. This Court has decided to set the fee award with respect to Dryvit in line with the lodestar amount for this defendant and the other defendants. In addition, this Court limited the fee award with respect to Sto in order to arrive at a fair allocation of the settlement fund between class counsel and class members. Thus, with the exception of the relatively small adjustments made to the amounts negotiated with Dryvit and Sto, this Court has decided to grant class counsel's fee request. The current settlements are both an improvement over the Senergy Settlement and the results are generally more favorable than the results in the cases brought by individual homeowners.

{51}     The Court has also reviewed the motion for reconsideration of the fee award granted in *In re Senergy* submitted by class counsel. The motion called into question the Court's authority for basing its fee award upon a consideration of the benefit to the class and an analysis of the Rule 1.5(b) factors. In its prior order, the Court exercised its discretion to fashion a reasonable fee award in light of the circumstances of the case. Because there is no North Carolina authority on the issue of determining a reasonable fee in common fund cases, the Court looked to federal and state law for guidance. In so doing, the Court determined that neither the percentage of the fund nor the lodestar methodology is wholly determinative in arriving at a reasonable fee in cases where the benefit to the class is uncertain. Therefore, the Court adopted a multi-factor approach to analyzing the fee request. The Court's analysis led it to fashion a payment plan which was designed to deal with the problem of uncertainty.

{52}     After reviewing its prior order, this Court believes that its analysis was correct and that the fee awarded was reasonable under the circumstances. However, the Court acknowledges that it is appropriate to revisit the fee award in light of the historical information now available. With this information, the Court has been able to more accurately predict the benefit to the Senergy class. Based on a clearer picture of the benefit to the class, this Court has decided to revise the fee award in *In re Senergy*.

{53}     In conclusion, the following chart depicts total fees awarded thus far in this litigation:

| Senergy | $ 3,000,000 |
|---|---|
| Parex | $ 1,750,000 |
| Continental | $ 571,500 |
| Bonsal | $ 750,000 |
| Sto | $ 500,000 |
| Dryvit | $ 5,700,000 |
| **Total** | **$12,271,500** (exclusive of USG) |

{54}   Therefore, it is hereby ordered, adjudged and decreed:

1. The Court approves an award of $1.75 million as part of the Parex settlement;

2. The Court approves an award of $571,000 as part of the Continental settlement;

3. The Court approves an award of $750,000 as part of the Bonsal settlement;

4. The Court approves an award of $5.7 million as a part of the Dryvit settlement.

5. The Court approves a distribution from the Sto settlement fund of $500,000 for attorney fees and expenses;

6. The Court approves a total award of $3 million from the Senergy settlement fund, and, after distributions from the settlement fund have reached $15 million (inclusive of attorney fees and expenses), class counsel is entitled to an additional payment of twenty-five percent (25%) of any direct distributions to class members (excluding administration costs) until the initial fund is exhausted.

This the 17th day of May, 2000.

Footnote 1   In late April 2000, settlement was reached with United States Gypsum ("USG").  The agreement is awaiting final approval from this Court.

Footnote 2 Claimants with Bonsal's SBC System will receive $4 per square foot of EIFS installed on their property.

Footnote 3  Continental's maximum obligation to the class is $2,541,000, plus attorneys' fees.  For claims that exceed that amount, Continental has the option of paying the claims, or having the claims revert back into the tort system.

Footnote 4  Under the terms of the Sto settlement, Sto must pay $2.5 million into a settlement fund. Pursuant to the proposed Plan of Distribution, each eligible claimant will receive his pro rata share of the funds available for distribution, based on the square footage of Sto EIFS on the claimant's property, without being required to show actual damage.  Former owners who did not reclad their property but show actual damage will be eligible for a payment of up to $1,000; former owners who did not reclad their property and show a reduction or credit in connection with the sale of their property will be entitled to a pro rata share.

Footnote 5  The proposed settlement with USG provides for the payment of attorneys fees and expenses not to exceed $200,000.

Footnote 6 The lodestar fee amount allocated to each defendant was determined by taking the time that related specifically to each defendant and adding a percentage of the general time applicable to all defendants. The general time was apportioned as follows:  one-half to Dryvit (because Dryvit is the largest manufacturer, it has the largest market share, its counsel took the lead in defending this litigation, it produced the most documents, it generated the most motion practice, and it was the first up for trial), with Parex being allocated one-third of the remaining one-half of general time (as Parex is believed to be the second largest manufacturer of EIFS distributed in North Carolina, and was second in line to be tried). The remaining general time was divided equally among Continental, Sto, Bonsal, Senergy and USG.

Footnote 7   To calculate the "time multiplier," expenses are subtracted out of both the total lodestar amount and the lodestar amount requested by plaintiffs for fees and expenses.  The remaining requested

amount is then divided by the remaining lodestar amount to get the multiplier.

Footnote 8  The maximum benefit to the Sto class is $2.5 million.  The award of $500,000 to class counsel represents twenty-five percent (25%) of the projected benefit to the class.  With respect to Dryvit, the Court's projected benefit is based on an estimated 1,200 homes with an average of 2,800 square feet (the average square feet for EIFS homes, according to the claims forms received in the Senergy Settlement).  Thus, 2,800 multiplied by $6 a square foot (the amount the Settling Defendants have agreed to pay) equals an average claim of $16,800.  Taking the average claim ($16,800) and multiplying that figure times the estimated number of homes (1,200) yields an estimated benefit to the class of $20.16 million, plus attorney fees to be paid on top of and not out of the settlement.

Footnote 9  As mentioned above, this concern has proven to be valid.  To date, just over $6 million has been paid out of the fund for settlement of claims and administration costs.  An initial award of $6 million would have yielded a fee far in excess of thirty percent (30%) of the actual fund.

Footnote 10  In fact, most commentators consider *Johnson* (which analyzed a percentage of the fund award in light of the twelve reasonableness factors) to be little different from *Lindy* (in which the court adjusted a lodestar amount based on certain factors, or "multipliers."   This is because "the first criterion of the *Johnson* test, and indeed the one most heavily weighted, is the time and labor required. Similarly, many of the *Johnson* factors are subsumed within the initial calculation of hours reasonably expended at a customary hourly rate." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. at  244.